993 A.2d 131

**PRIME RATE PREMIUM FINANCE CORPORATION, INC.,**

v.

**MARYLAND INSURANCE ADMINISTRATION.**

No. 02800 Sept.Term, 2008.

Court of Special Appeals of Maryland.

March 31, 2010.

Joel L. Perrell, Jr. (Katherine B. Hill, Miles & Stockbridge PC, on the brief), Baltimore, MD, for Appellant.

J. Van Lear Dorsey (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DAVIS, JAMES R. EYLER and MATRICCIANI, JJ.

MATRICCIANI, Judge.

Appellant Prime Rate Premium Finance Corporation, Inc. ("Prime Rate") appeals from the decision of the Circuit Court for Baltimore City affirming the Insurance Commissioner's Final Order in favor of the appellee Maryland Insurance Administration ("MIA") and disapproving Prime Rate's revised premium finance agreement. The appellant presents one question for our review:

I. Did the Commissioner err by affirming MIA's disapproval action and concluding that the provision contained in paragraph 16 of Prime Rate's proposed premium finance

agreement violates Md.Code (1996, 2006 Repl. Vol.), § 23–405 of the Insurance Article ("IA")?

## FACTS

Prime Rate is a premium finance company[1] registered to do business in Maryland with the MIA. On October 25, 2007, Prime Rate submitted a revised premium finance agreement to the MIA for approval. Paragraph sixteen of the proposed agreement read, in pertinent part: "the ABOVE NAMED insured … (16) [a]grees that any refunds may be applied against any prior debts owed [Prime Rate]."

On November 8, 2007, the MIA advised Prime Rate that a number of provisions of the agreement would have to be revised or eliminated in order for the agreement to be approved. The MIA requested that paragraph sixteen be deleted in its entirety because the language allowing Prime Rate to withhold from the refund the amounts of "any prior debts" contravened the mandatory language of IA § 23–405(b). This section provides that the premium finance company "shall refund to the insured the amount of unearned premium that exceeds any amount due under the premium finance agreement."

The parties were able to resolve all issues with regard to the proposed agreement except for paragraph sixteen. On May 16, 2008, the MIA disapproved the proposed agreement. On June 16, 2008, Prime Rate requested a hearing pursuant to IA § 2–210.

On August 26, 2008, the Insurance Commissioner held a hearing on the denial of the proposed agreement. Prime Rate did not present any testimony. The MIA offered, without

---

1. Premium finance companies finance an insured's premiums payable to an insurer under an insurance policy. The insured promises to pay a premium finance company the amount advanced or to be advanced under the agreement, together with interest and a service fee. IA § 23–101(b)(i). A premium finance agreement typically "contains an assignment of or is otherwise secured by the unearned premium or refund available from the insurer on cancellation of the insurance contract." IA § 23–101(b)(ii).

objection, the testimony of Associate Commissioner P. Randi Johnson, who explained the basis for the MIA's denial and also stated that the MIA has uniformly and consistently taken the position that the proposed revision is inconsistent with IA § 23–405.

On September 10, 2008, the Commissioner issued a Final Order and statement of reasons in support of the order and upheld the MIA's rejection of the proposed agreement. The Commissioner found that the refund contemplated by IA § 23–405 is mandatory and that the statute would be "weakened considerably" if the premium finance company could "reduce (potentially to zero) the refund to collect a debt arising under some other and separate financing agreement." To conclude, the Commissioner found that "the General Assembly's intent in § 23–405(6)(1) is unambiguous, and the MIA was obliged to honor that intent." On January 22, 2009, the Circuit Court for Baltimore City affirmed the MIA Final Order. The appellant has timely appealed.

## DISCUSSION

### I.

Prime Rate contends that the MIA rejected its proposed agreement based upon an erroneous interpretation of IA § 23–405(b)(1). Prime Rate argues that the MIA and the Commissioner inserted limitations into § 23–405 that do not exist. Prime Rate argues that the General Assembly expressly prohibited the use of set offs by insurance companies in IA § 23–405(e) and, therefore, by implication § 23–405(b) should not include a similar exclusion.[2] Prime Rate argues that the MIA and Commissioner's interpretation of IA § 23–405(b)(1) means that Prime Rate must return premiums to the insured even though Prime Rate cited at least two examples of situations in which a premium finance company may be compelled

---

**2.** Appellant contends that the statutory scheme contained in IA § 23–401 to IA § 23–406, when read in its entirety, is aimed at insurers, not at premium finance companies.

to pay an insured's premium to a third party. Prime Rate also argues that the Commissioner's Final Order shows that the Commissioner relied upon facts that were not in the record.

Judicial review of an administrative decision is narrow. *United Parcel v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226 (1994). We must determine if the administrative decision is premised upon an erroneous conclusion of law. *Id.* at 577, 650 A.2d 226. The reviewing court should ordinarily respect the agency's expertise and give weight to its interpretation of a statute that it administers. *Christopher v. Montgomery County HHS,* 381 Md. 188, 198, 849 A.2d 46 (2004).

When the words of a statute are clear and unambiguous, according to their commonly understood meaning, our inquiry ordinarily ends. *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 212, 783 A.2d 194 (2001). Canons of construction are "no more than rules of thumb that help courts determine the meaning of legislation" and we must "presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Therefore, only when a term is reasonably susceptible to more than one meaning do we consider extrinsic evidence in order to ascertain its meaning. *Fister,* 366 Md. at 216, 783 A.2d 194.

The relevant statutory excerpt from the Insurance Article is the following:

### § 23–405. Return of Premium after cancellation

\* \* \*

(b) Insurer responsible for unearned premiums.—

(1) After the insurer returns to the premium finance company any gross unearned premiums that are due under the insurance contract, the premium finance company shall refund to the insured the amount of unearned premium that exceeds any amount due under the premium finance agreement.

(2) A premium finance company need not make a refund to the insured if the amount of the refund would be less than $5.

■  The dispute in this case is about the precise meaning of "the premium finance company shall refund to the insured the amount of unearned premium that exceeds any amount due under the premium finance agreement." IA § 23–405(b)(1). The Insurance Commissioner concluded in his Final Order that "the return to the insured of unearned premium in excess of any amount due under the [as in singular and present] premium finance agreement is required." The Court of Appeals has held that "the use of the word 'shall' in a statutory provision indicates that the provision is mandatory and that no discretion was intended." *Resnick v. Board of Supervisors of Elections*, 244 Md. 55, 62, 222 A.2d 385 (1966). Thus, the sole issue we must address is whether "the premium finance agreement" can be read in such a manner so that it incorporates debts associated with other agreements between the premium finance company and the insured.[3]

Although there is no definition section of the statute, if we presume, as we must, that the legislature means what it says, then "the premium finance agreement" must refer to a single agreement. As the Commissioner pointed out in his Final Order, allowing paragraph sixteen to be included in the agreement would permit Prime Rate the contractual right to set off or reduce the amount of any refund to the insured by the amount of an asserted prior debt owed by the insured to Prime Rate. We fail to see how, based on the plain language of the statute, the legislature could have intended this result. We are being asked essentially to rewrite the statute so as to achieve, from the perspective of Prime Rate, a fair result for both the premium finance company and the insured. Regardless of whether, as Prime Rate asserts, the offset provision

---

**3.**  A number of policies may be covered by a single premium finance agreement but the Insurance Commissioner limited unearned premium retention to amounts due the insurer on only the policies covered by the one agreement at issue at any given time.

may provide an "amicable settlement of corresponding . . . obligations" or provides a "mechanism . . . to mitigate costs and expenses of collection of delinquent accounts"[4], we will not "engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. Nations-Bank, N.A.,* 365 Md. 166, 181, 776 A.2d 645 (2001).

Prime Rate relies heavily on the principle of freedom of contract when arguing for the inclusion of paragraph sixteen. The problem with this reliance is that the legislature has, by requiring the MIA's approval of any changes to a premium finance agreement, converted these contracts into non-negotiable instruments. IA § 23–206(b). Even if the insured wished to opt out of the provisions in paragraph sixteen, it would not be able to because of the way the Insurance Article is structured.[5]

The case of *The Great Southwest Fire Insurance Company v. Thomas J. Huss,* 49 Md.App. 447, 433 A.2d 1169 (1981), although not directly discussing the contested statutory provision, supports the Commissioner's interpretation of the statute.[6] In *Great Southwest,* when addressing the unrelated

---

**4.** While we need not address these contentions in full, it is worth noting that this argument is premised on the tenuous assumption that summarily surrendering the unearned premium to the premium finance company is in the best interest of the insured. As the Commissioner correctly points out, use of the set off provision would exist "notwithstanding the absence of any adjudication or other due process proceeding in which it had established the validity of the prior debt and in which the insured could challenge the validity of the prior debt." Furthermore, an aggrieved premium finance company is free to initiate collection efforts in order to generate a favorable judgment whereby it could retain funds.

**5.** Paragraph sixteen is also unnecessary to protect Prime Rate or other premium finance companies. These companies are under no obligation to issue a new loan to an individual who has defaulted on a prior loan.

**6.** In our view, the Commissioner used tools of statutory construction to determine that the statute was drafted to protect consumers, rather than impermissibly using facts that were not in the record as Prime Rate argues. The Commissioner began with the plain language of the statute, as the canons of statutory interpretation require, and found that

issue of whether a premium finance company was negligent in not sending a request for reinstatement of coverage to an insurer, we addressed the purpose of the precursor to Title 23 of the present Insurance Code:

> The purpose of the statute, enacted to curb abuses in the previously unregulated premium finance industry, was summarized ... as follows:
>
>> "Included in the mischief which resulted from unregulated premium finance agreements was the extraction of usurious interest and excessive service charges. But, perhaps the greatest danger posed by these agreements flowed from the finance company's right to cancel an insurance policy without notice to the insured when a repayment installment was not made, usually leaving the insured unaware that he was without coverage and significantly jeopardizing the protection available to an innocent victim of the now uninsured's negligence."

*Id.* at 455, 433 A.2d 1169 (citation omitted).

Statutory history also supports the Commissioner's finding that return of the unearned premium is mandatory. The prior version of IA § 23–405(b)(1) stated:

> If crediting of return premiums to the account of the insured causes a surplus over the amount due from the insured, the premium finance company shall refund the surplus to the insured as soon as reasonably possible not exceeding 15 business days after the premium finance company receives all return premiums.

This sentence was deleted when legislators drafted the current version in 1997. The removal of the first part of this sentence is especially noteworthy because the presence of the word "account" would have provided stronger evidence that the legislature intended to allow the sort of set off contemplated in this case. As it now reads, the returned premium may only be set off by the "amount due under the premium finance

---

"the plain language of § 23–405(b)(1) prohibits precisely what Prime Rate seeks to do by way of paragraph no. 16."

agreement." The word "account" could conceivably have included more than one premium finance agreement. Thus, the deletion of the above sentence provides further support for the Insurance Commissioner's interpretation of the statute.

Nevertheless, Prime Rate argues that the General Assembly could have expressly prohibited set offs if it had so desired and that its decision not to prohibit set offs means that they are permissible. Prime Rate cites to *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Gartelman,* 288 Md. 151, 156, 416 A.2d 734 (1980), where the Court of Appeals held that "[w]here a statute expressly provides for certain exclusions, other[s] should not be inserted." IA § 23–405(e) states that "[a]n insurer may not deduct from any return premium any amount owed to the insurer by the insured under any other insurance contract." Prime Rate argues that the Commissioner's interpretation of § 23–405(b) renders § 23–405(e) "entirely superfluous."

We do not agree. The Commissioner's interpretation of § 23–405(e) is consistent with the legislature's purpose in enacting the statute.[7] Prohibiting both insurers and premium finance companies from deducting amounts owed under other contracts is consistent with the statutory command that unearned premiums should be returned to the insured. Furthermore, subsection (b)(ii) of § 23–405, which states that "[a] premium finance company need not make a refund to the insured if the amount of the refund would be less than $5," is an express exclusion from the statutory command that the premium finance company shall return the funds to the insured.

Although there may be situations where the premium finance company is compelled to pay an insured's premium to a third party because of bankruptcy or garnishment proceedings, this fact should not be used to eviscerate the expressed will of the General Assembly. We hold that the Insurance

---

7. The MIA argues and we concur that the statutory scheme is broader than suggested by appellant and includes the concept of consumer protection as a legislative goal.

Commissioner did not err in disapproving Prime Rate's proposed premium finance agreement for the reasons stated in the Insurance Commissioner's Final Order.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**